# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 21-1423V**

|  |  |
|---|---|
| STEPHEN RINEHART,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: February 2, 2026 |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL, for Petitioner.*

*Ryan Pohlman Miller, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On June 2, 2021, Stephen Rinehart filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on September 30, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I find the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent argued that Petitioner is not entitled to compensation (ECF No. 38), and the parties have now fully briefed the claim (ECF Nos. 48, 52, 53). For the reasons set forth below, I find that record evidence preponderantly establishes that Petitioner likely experienced residual effects of his injury for more than six months, suffered the onset of shoulder pain within 48 hours of vaccination, demonstrated that another condition would not explain his post-vaccination symptoms, and satisfied the remaining requirements for a Table SIRVA, and therefore is entitled to compensation.

## I.      Relevant Factual History

### A.  Medical Records

Petitioner received a flu vaccine in his right deltoid on September 30, 2020. Ex. 9 at 5. Two and a half months later (December 18, 2020), he saw orthopedist Vincent Key, M.D., for right shoulder pain. Ex. 3 at 7. The record of this visit contains varying descriptions of the onset of Petitioner's pain, describing it as "right shoulder pain that's been present for 1-2 months," stating that "he did have a flu shot and has noticed pain in his shoulder ever since," and documenting that "PT STATES THAT IT STARTED AFTER FLU SHOT X1 MOS, PT STATES THAT PAIN GETTING WORSE SINCE THE SHOT." *Id*. The record adds that Petitioner "works loading pallets and has experienced difficulty doing this" (*Id*.), although Petitioner maintains that this is incorrect and he was not working at this time.[3] ECF No. 48 at *33.

On examination, Dr. Key determined that Petitioner exhibited a "global decrease in active and passive range of motion," with positive results on the Neer, Hawkins, and cross arm tests. Ex. 3 at 8. A right shoulder x-ray showed mild acromioclavicular joint arthritis but was otherwise normal. *Id*. Dr. Key assessed Petitioner with right shoulder adhesive capsulitis; he recommended physical therapy ("PT") and referred Petitioner to another specialist for a cortisone injection. *Id*. Three days later (December 21, 2020), Petitioner saw sports medicine specialist David Smith, M.D., who administered a right shoulder cortisone injection. *Id*. at 31.

On December 23, 2020, Petitioner underwent a PT evaluation of his right shoulder. Ex. 2 at 8. The record of this evaluation indicates an onset date of September 29, 2020 - - one day *before* vaccination - and states that the shoulder pain occurred "following a reaction to a flu shot on 9/*21*/20," misstating the date of vaccination. *Id*. Petitioner rated his pain seven out of ten, ranging between two at best and ten at worst. *Id*. His pain was

---

[3] Petitioner cites several declarations in support of his claim that he was not working during this time period ECF No. 48 at *33. However, the testimony he cites concerns his layoff in September 2020 and his return to his former employer in March 2021, and does not address his employment status in December 2020.

worse in the evening and kept him up at night. *Id*. Petitioner continued PT until March 9, 2021.

Petitioner followed up with Dr. Key on February 1, 2021, four months after vaccination. Ex. 3 at 46. He reported significant improvement in his symptoms following the cortisone injection and PT. *Id*. He continued to experience pain from time to time with certain maneuvers, but overall was happy with his improved range of motion and pain. *Id*. On examination, Dr. Key found that he exhibited improved internal rotation, but continued to have positive Neer and Hawkins signs. *Id*.

At a February 3, 2021 PT session, Petitioner reported a "roughly 65% recovery since start of therapy." Ex. 2 at 32. He was able to raise his hand above his head with less difficulty, and felt his range of motion had greatly improved. *Id*. He continued to report trouble reaching behind his back, and occasionally felt pain with reaching out and lifting. *Id*. At a March 2, 2021 PT session, Petitioner reported that he was sore after "moving a lot of boxes over the weekend." Ex. 34 at 10.

On March 9, 2021, Petitioner attended his final PT session. Ex. 2 at 37-42. Petitioner stated that "he has made [an] excellent recovery and is ready to be discharged to continue with HEP [home exercise program] independently." *Id*. at 37. Petitioner reported excellent progress in right shoulder strength and range of motion, and was able to lift his arm overhead and behind his back "much better" and sleep without pain. *Id*. Petitioner planned to continue working on range of motion in external rotation at home. *Id*. Petitioner's reported pain levels remained the same as at the start of care: seven out of ten at the time of the appointment, ranging from two at best to ten at worst. *Id*. The therapist stated that Petitioner had shown excellent effort and "has met all goals for therapy" – despite the fact that one of the therapy goals was to decrease his pain to less than two out of ten, which the record suggests had not occurred. *Id*. at 38.

Petitioner subsequently saw his cardiologist on March 23, 2021, for an "[a]cute visit." Ex. 7 at 172. He underwent an electrocardiogram and echocardiogram two days later. Ex. 6 at 19, 26. Neither record mentions shoulder pain. Petitioner received COVID-19 vaccines in his left deltoid on March 31 and April 21, 2021. Ex. 37 at 2-3. Petitioner's cardiologist ordered labs, which were drawn on October 12, 2021; unsurprisingly, the lab record does not list any shoulder complaints.[4] Ex. 6 at 52. Petitioner received a flu vaccine

---

[4] Respondent asserts that Petitioner also saw his cardiologist without mentioning shoulder pain on May 13, 2021. ECF No. 52 at *7. However, the cited record (Ex. 6 at 67) is a May 13, 202*0* record – over four months *before* vaccination. Even if Petitioner did see his cardiologist without seeking care for his shoulder on May 13, 2021, this would have little relevance to the question whether Petitioner was still experiencing residual effects of his injury at that time, given that it would not be expected for a patient to seek shoulder treatment from a cardiologist.

in his right deltoid on October 14, 2021, and a COVID-19 vaccine in his right deltoid on December 26, 2021. Ex. 4 at 6; Ex. 6 at 48.

### B. Testimonial Statements

Petitioner filed three declarations[5] in support of his claim.[6] Exs. 1, 11, 35. He states that during the administration of the vaccine at issue in this case, he felt more pain than previous vaccinations, and noticed that the injection site was higher than usual. Ex. 1 at ¶ 7. He experienced pain and soreness at the injection site immediately after vaccination. *Id*. at ¶ 8. Thereafter, his pain steadily worsened. *Id*.

Initially, Petitioner thought the pain would resolve with time and movement. Ex. 1 at ¶ 9. Instead, the pain worsened and his shoulder became stiff, with decreased range of motion. *Id*. Because the pain persisted, he sought medical treatment. *Id*. at ¶ 10. PT improved his range of motion, but his pain persisted. *Id*. at ¶ 12.

Petitioner signed his initial declaration on April 28, 2021 – just over six months after vaccination. Ex. 1. In it, he states that "[s]ince the time the vaccine was administered, I have consistently experienced right shoulder pain and decreased range of motion." *Id*. at ¶ 13. He states that he has not sought medical care with the urgency or frequency he otherwise would have due to the COVID-19 Pandemic and because he was laid off on September 30, 2020 (the day of vaccination) due to the Pandemic, affecting his health insurance. *Id*.

In his declaration signed on August 15, 2024, Petitioner states that his pain remains two out of ten at best, and is usually three to four, sometimes increasing to ten out of ten. Ex. 35 at ¶ 15. Pain interferes with normal daily activities and hobbies. *Id*. at ¶ 16.

Petitioner explains that when he stopped PT in March 2021, his pain continued to range between "one out of ten at best and eleven out of ten at worst." Ex. 11 at ¶ 34. However, his *overall* pain was improved in that he experienced intense spikes of pain less frequently, and his pain stayed at lower levels more often. *Id*. He never followed up with Dr. Key after his February 2021 appointment because the cortisone injection had not helped and he did not think there was much else Dr. Key could do to help him. *Id*. at ¶ 35.

---

[5] Although Petitioner labeled Exhibit 1 and 35, as well as the remaining testimonial statements, as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations sworn under penalty of perjury. 28 U.S.C. § 1746.

[6] Petitioner's initial declaration, ECF No. 7, is not labeled with an exhibit number, but a later-filed exhibit list identifies it as Exhibit 1. Additionally, this declaration appears to be missing the fourth page. Petitioner also filed a declaration on January 9, 2023, ECF No. 23, which was later stricken. Scheduling Order and Order Striking, issued April 29, 2024 (ECF No. 39).

At the time he stopped PT, his range of motion had improved, but he was "still in a lot of pain going past that range of motion." *Id*. at ¶ 37.

Petitioner explains that he stopped PT in early March 2021 not because either he or the therapist determined that he no longer needed therapy. Ex. 11 at ¶ 37. Instead, stopping therapy was "entirely due to" his former employer offering him a job that he "could not refuse." *Id*. Petitioner explains that from his layoff on September 30, 2020 until March 2021, he was "in a constant search for a new job." *Id*. at ¶ 38. He spent hours every day looking and applying for jobs, with no response. *Id*. Pandemic-related restrictions had "crushed the job market" in his industry. *Id*. He thinks his age (62 at the time) was also a factor. *Id*. Additionally, he worked as a driver, which requires passing a Department of Transportation ("DOT") medical examination. *Id*. at ¶ 39. His DOT card had expired in late 2020, and at the time he could not raise his arm above his head and shoulder – a requirement of the DOT examination – due to his SIRVA. *Id*. This limited the jobs for which he was qualified. *Id*.

On March 1, 2021, his former employer called to offer him a position as warehouse manager. Ex. 11 at ¶ 40. Taking the job meant he would not be able to continue PT, but he felt he had to take the job or he may never work again. *Id*. By this time, he had improved enough to pass the DOT examination. *Id*. at ¶ 43.

Petitioner states that as of March 9, 2021, when he stopped PT, he was "still suffering serious right shoulder SIRVA symptoms," including pain and limited range of motion. Ex. 11 at ¶ 41. He wanted to continue PT, and thinks it would have improved his condition. *Id*. He continued to experience "near-constant excruciating pain" until around mid-September 2021. *Id*. at ¶ 48. At that time, he noticed his pain gradually improving. *Id*. at ¶ 49.

Petitioner explains that he has not allowed his injury to deter him from getting vaccines. Ex. 11 at ¶ 51. However, he now shows the vaccine administrator, and often draws on his shoulder, where he wants it placed. *Id*. at ¶ 52.

Dr. Key submitted a signed statement dated April 26, 2021 on Petitioner's behalf. Ex. 10 at 3. Dr. Key states that after vaccination, Petitioner developed acute shoulder pain that "could have been an inflammatory response" and "could have caused some of his shoulder pain." *Id*.

Petitioner submitted a declaration from a co-worker, Matt Love. Ex. 16. Mr. Love states that when Petitioner returned to their company in March 2021, he saw Petitioner at least once a week. *Id*. at ¶ 7. At that time, it was "visibly obvious that he was working in pain." *Id*. at ¶ 8. Mr. Love saw Petitioner grimace or wince when handling items, and sometimes reach out to pick something up but have to pull back. *Id*. Mr. Love noticed that Petitioner often worked one-handed. *Id*. Mr. Love states that Petitioner continued to

demonstrate signs of pain for a significant period of time, at least a few months after he returned to work. *Id*. at ¶ 11.

Gary Breeden, another co-worker of Petitioner, submitted a declaration on his behalf. Ex. 18. Mr. Breeden states that within days of Petitioner returning to work, he saw Petitioner using only his non-injured arm and it was "evident that Stephen's shoulder was hurting." *Id*. at ¶ 7. He observed Petitioner rubbing his shoulder, and having difficulty reaching up to take something off of a shelf. *Id*. Mr. Breeden and other co-workers sometimes saw Petitioner struggling to lift or reach for something and helped him, and Petitioner sometimes asked for help. *Id*. at ¶ 8. Mr. Breeden states that Petitioner's shoulder had not fully recovered when Mr. Breeden retired in October 2023. *Id*. at ¶ 11.

## II.    The Parties' Arguments

### A.  Severity

Petitioner asserts that his SIRVA symptoms have persisted to the present date, over 43 months. Petitioner's Motion for Ruling on the Record, filed Nov. 15, 2024, at *37-44 (ECF No. 48) ("Mot."). When he concluded PT, although his range of motion and strength had improved, his pain levels remained the same as they had been at his evaluation. Mot. at *38. He stopped PT due to accepting a job and financial considerations, not because he was fully recovered. *Id*. at *39. Petitioner asserts that he did tell his cardiologist about his shoulder pain, in response to questions about his physical activity. *Id*. at *40. However, he did not seek treatment for his shoulder pain from his cardiologist, and otherwise that "it is not necessarily surprising that the cardiologist failed to record Stephen's SIRVA symptoms." *Id*.

When Petitioner returned to work in mid-March 2021 he remained impaired, and used creative techniques to move and lift boxes. Mot. at *37. His co-workers also helped him from time to time. *Id*. Petitioner objects to Respondent's assertion that the medical record evidence contradicts the testimonial evidence. *Id*. at *41. And Petitioner points out that the PT records themselves are inconsistent, stating that he satisfied all therapy goals despite the fact that pain reduction was one of his goals and the records demonstrate no improvement in pain. *Id*. at *43.

Respondent argues that Petitioner has not satisfied the statutory severity requirement, and thus is not entitled to compensation. Respondent's Response, filed Jan. 9, 2025, at *10-14 (ECF No. 52) ("Resp."). Respondent emphasizes that Petitioner's last treatment for shoulder pain occurred five months and nine days after vaccination, at which time he was discharged from PT. Resp. at *10-14. At that time, Petitioner reported "excellent progress" and his therapist noted that he had met all therapy goals. *Id*. And he infers that Petitioner appears to have been "well enough to do strenuous activity using his shoulder" by late February 2021: on March 2nd he reported being sore from moving boxes over the weekend. *Id*. at *11-12.

Respondent adds that Petitioner received medical care and treatment on at least eight occasions in the nine months after vaccination – although the care he lists includes only encounters to receive vaccines and see a cardiologist. Resp. at *12. And Petitioner received two vaccines in his right – injured – arm in October and December 2021, which Respondent emphasizes further suggests that his pain had resolved. *Id*. at *12-13. Respondent cites an "apparent conflict" between contemporaneous medical records (establishing that Petitioner treated his injury for less than six months, after which he did not seek further treatment and received two vaccines in his affected shoulder) and later testimonial statements (asserting continuing symptoms after he stopped formal treatment), and asserts that the medical records should be given greater weight. *Id*. at *13.

### B. Onset

Petitioner asserts that his pain began immediately after vaccine administration on September 30, 2020. Mot. at *27. Although the record of his first treatment in December 2020 contains a vague description of onset, Petitioner asserts that "it is unambiguous that the pain started with [my] flu shot." *Id*. The PT evaluation similarly states that his pain had been present since vaccination. *Id*. Petitioner states that two of his daughters are nurses, and he and his wife consulted with them on the date of vaccination about his shoulder pain. *Id*. at *30. He delayed seeking formal care due to the Pandemic and a belief that his symptoms would resolve on their own. *Id*. at *31.

Respondent argues that Petitioner cannot establish Table onset because he did not seek care until two months and 18 days after vaccination, at which time he reported a one to two month history of pain. Resp. at *15. Although this treatment record also states that Petitioner had received a vaccine and had pain in his shoulder ever since, Respondent asserts that "[t]his description is vague, and does not preponderantly place the onset of petitioner's injury" within 48 hours. *Id*. Respondent states that the "date of vaccination is a very clear marker and definitive date," but rather than reporting that date Petitioner "reported a vague timeline of one to two months." *Id*. Respondent adds that this "vague onset" would place the start of Petitioner's symptoms either 18 days after vaccination or a month and 18 days after vaccination – both of which are well outside the Table timeframe. *Id*. In Respondent's view, Petitioner's "ambiguous" report of pain "ever since" vaccination is not sufficient to establish that his pain began within 48 hours. *Id*.

### C. Whether Another Condition Would Explain Post-Vaccination Symptoms

Respondent notes that Petitioner's x-ray showed acromioclavicular joint arthritis, and therefore asserts that "it is possible there was an alternate cause for his shoulder pain." Resp. at *16. Respondent does not further develop this argument or cite additional evidence suggesting arthritis caused Petitioner's pain.

Petitioner asserts that prior to vaccination, he was fit and active, with no shoulder impairment. Mot. at *36. After vaccination, he experienced immediate pain and difficulty with normal activities of daily living. *Id*. Petitioner views Respondent's suggestion that arthritis may have caused his shoulder pain as unsupported. Petitioner asserts that "Dr. Key's opinion directly contradicts such speculation, as Dr. Key stated that the 'minimal acromioclavicular arthrosis' would not explain Stephen's SIRVA symptoms" – although this statement goes far beyond the cited evidence: Petitioner does not cite any opinion or statement of *Dr. Key* to this effect, but only the x-ray report and *Petitioner's* declaration stating that Dr. Key told him there was no reason for the pain reflected in the x-ray. *Id*. (citing Ex. 3 at 28, Ex. 11 at ¶ 31).

### III.    Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

8

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[7] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

"[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at \*4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at \*3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at \*5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where the petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where petitioner did not seek additional treatment after the five-month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria

---

[7] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time-frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

## IV.    Ruling on Entitlement

### A.  Severity

The record supports a finding that Petitioner likely experienced residual effects of his injury for more than six months. Petitioner treated his shoulder injury until over five

months after his pain began. A month prior to his last PT session, Petitioner reported 65% progress. Although he stopped formal treatment just before the six-month mark, the last treatment record does not indicate that his condition had fully resolved. Rather, it shows that his pain levels remained unchanged. Although the record states that all therapy goals had been met, one of his goals was pain of less than two out of ten – which the record itself did not show had been met.– meaning that his condition had *not* fully resolved. Thus, his symptoms likely persisted until at least the end of March 2021, which satisfies the statutory severity requirement.

Petitioner has convincingly explained that he stopped treatment not because his condition had resolved, but because he was offered a job following months of unsuccessful job searching after a layoff. And even if I were to infer that Petitioner's receipt of two vaccines in his right arm in late 2021 meant that his condition had likely resolved by that time, that would not suggest that it had resolved months *before* that.[8] I also give some weight to the fact that Petitioner's first sworn witness statement was prepared in April 2021, the month right after both the arrival of the severity deadline and his last PT treatment. It is reasonable to infer that Petitioner at that time was likely still experiencing sequelae of his injury, as he then alleged, and Respondent has offered no reason to doubt the truthfulness of this witness contention.

### B. Onset

The record supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Although Petitioner did not seek formal medical treatment for approximately two and a half months, I have previously stated that a treatment delay of this length does not, by itself, raise serious concerns about onset. *Tully v. Sec'y of Health & Human Servs*., No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset was within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs*., No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

Respondent argues that the *medical record* of Petitioner's first treatment "does not preponderantly place the onset" of Petitioner's injury within 48 hours. Resp. at *15. However, the Vaccine Act does not require that a particular medical record

---

[8] The record does not support Petitioner's claim that his injury persisted for 43 months. The record shows that he stopped treatment just over five months after vaccination. It is reasonable to infer that his condition resolved shortly thereafter.

11

preponderantly establish Table onset; rather, a *preponderance of the evidence as a whole* must support such a finding. Section 13(b)(2).

Respondent also takes issue with the fact that Petitioner described onset vaguely, rather than specifically stating that his pain began on the date of vaccination. However, there is no requirement that a medical record reflect that a claimant specified a precise onset date. And it is not uncommon for patients to describe the duration of their pain in weeks or months, rather than providing a specific date of onset. *See Roberson v. Sec'y of Health & Human Servs.*, No. 21-2309V, 2025 WL 605724, at *7 (Fed. Cl. Spec. Mstr. Jan. 24, 2025) (finding onset within 48 hours where claimant sought care 23 days after vaccination reporting pain that had been present for 'two or three weeks,' noting that many people speak in colloquial terms when seeking medical care).

The record of Petitioner's first visit states that his pain had been present for one to two months, but elaborated that the pain had been present *ever since* vaccination. Ex. 3 at 7. Similarly, at his PT evaluation, he stated his pain began after vaccination, although he misremembered the precise date the vaccine was received. Ex. 2 at 8. And Petitioner has offered supporting testimonial evidence.

I do not view the medical records and testimonial evidence as being in conflict. Rather, the medical records shed some light on the question of onset, but are themselves somewhat incongruous.[9] The testimonial evidence provides additional details consistent with the medical records. All of this evidence in its totality supports a favorable onset finding.

### C. Petitioner's Arthritis Would Not Explain His Post-Vaccination Symptoms

The record does not support a finding that Petitioner's arthritis would likely explain his post-vaccination symptoms. Although Petitioner's x-ray showed arthrosis, the report described it as "[m]inimal." Ex. 3 at 28. Petitioner's minimal arthritis presumably was present before vaccination, as it is degenerative. But there is no evidence to suggest that Petitioner suffered right shoulder pain before vaccination. And Petitioner's treaters did not attribute his pain to arthritis.

### D. Factual Findings Regarding QAI Criteria for Table SIRVA and Other Entitlement Requirements

Respondent does not contest the remaining statutory and SIRVA requirements, and I find that they are preponderantly satisfied. Petitioner's shoulder ROM was limited,

---

[9] The record of the December 18, 2020 appointment states on, on a single page, that the pain was present "for 1-2 months," after a flu shot "X1 MONTHS," and "ever since" his flu vaccination. Ex. 3 at 7. This record could be read to support a one-month onset, onset between one and two months, or onset on the date of vaccination.

his symptoms were limited to his shoulder, and the record does not contain preponderant evidence that Petitioner had a history of right shoulder pain that would explain his post-vaccination symptoms. Ex 3 at 8; Ex. 7 at 196, 204.

Petitioner received a covered vaccine in the United States. Ex. 9 at 5. And he states that he has not filed any action, resolved a claim for damages, or received compensation in the form of an award or settlement for his vaccine-related injury. Ex. 11 at ¶¶ 66, 67. Thus, Petitioner is entitled to compensation.

**Conclusion**

Based on my review of the record as a whole, I find that it is more likely than not that Petitioner's shoulder pain began within 48 hours of vaccination, persisted for more than six months, and no other condition would explain his post-vaccination symptoms. I also find that all SIRVA Table requirements are preponderantly met, as are all statutory requirements for entitlement. Therefore, Petitioner's motion for a ruling on the record that he is entitled to compensation is **GRANTED**.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master